# CONFRONTING THE REPTILE IN VIRGINIA

Taylor Denslow Brewer*

"The function of the jury is to decide according to the evidence, not according to how its members might wish to be treated."[1] Although most lawyers in Virginia would agree with this statement and would acknowledge that it represents long-standing precedent, the application of Reptile Theory to litigation threatens its foundation with a form of trial advocacy that manipulates human emotions and improperly shifts the focus of the case. Reptile Theory originated in 2009 and continues to gain momentum. Attorneys who employ reptilian tactics urge jurors to react instinctively to perceived risks that extend beyond the facts of the case at issue. These attorneys attempt to make the case about fear and self-preservation and not about the evidence.

## I. THE REPTILE THEORY

### A. THE THEORY DEFINED

In 2009, attorney Don Keenan and jury consultant David Ball published *Reptile: The 2009 Manual of the Plaintiff's Revolution.*[2] The book's themes incited panic in the defense bar and quickly became the basis of the infamous "Reptile Revolution" movement by plaintiffs' attorneys toward emotion-driven trial tactics. The movement has been described both as "the greatest development in litigation theory in the past 100 years"[3] and a "ubiquitous threat to defendants across the nation."[4] The home page of Ball and Keenan's current web site proclaims, "Welcome to the Revolution," and showcases the head of an open-mouthed snake with its fangs extended. The authors boast of more than $7.7 billion in verdicts and settlements attributed to Reptile Theory tactics[5] and use their web site to advertise and sell live and on-line seminars on topics such as

---

* Ms. Brewer is an associate in the Richmond office of Goodman Allen Donnelly and is a member of the Virginia Association of Defense Attorneys.

[1] Seymour v. Richardson, 194 Va. 709, 715, 75 S.E.2d 77, 81 (1953) (citing Lorillard Co. v. Clay, 127 Va. 734, 752, 104 S.E. 384, 390 (1920)).

[2] DAVID BALL & DON C. KEENAN, REPTILE: THE 2009 MANUAL OF THE PLAINTIFF'S REVOLUTION 52-66 (2009) at 17–18, *available at* https://reptilekeenanball.com

[3] Bill Kanasky, Jr., & Ryan A. Malphurs, *Derailing the Reptile Safety Rule Attack: A Neurocognitive Analysis and Solution*, COURTROOM SCIENCES 2, *available at* https://courtroomsciences.com/News/Articles/8a196a12-63ae-90fa-58637cf7c4a4 ("*Derailing the Reptile Safety Rule Attack*").

[4] *Id.*

[5] BALL & KEENAN, *supra*, note 2.

EXHIBIT I

"Reptile in Opening" and "Reptile in Med Mal." No attorneys can register for those programs until they are "verified as a Plaintiff's lawyer or as a member of a Plaintiff's firm."[6]

The basis of the Reptile Theory is that humans cannot help but act instinctively to protect themselves, their families, and their communities.[7] If a snake feels threatened, the snake will act instinctively and try to protect itself either by retreating to a safe position or—if it cannot do that—by striking at the source of the peril.[8] Likewise, if a juror senses a threat to his safety and is made to feel there is no way to eliminate that threat, he will protect himself by striking at the source of that danger (*viz.*, the defendant) by rendering an enhanced verdict. The defendant offender could be a corporation that manufactured a product portrayed by a Reptile lawyer as a threat to the safety of the general community, a driver whose violations of the the rules of the road put everyone else on the road at risk, or a person whose criminal behavior poses a broad danger to the general population.

According to Reptile Theory, the plaintiff should make her case resonate not in the jurors' "thinking brains" but in their more primitive, reactive "reptilian brains" by making them feel personally, although unconsciously, threatened by the defendant's behavior. If the ploy is successful, the expected result is that the jurors will react as reptiles: by striking at the danger with a conviction or a large verdict.[9]

The psychological theory behind Reptile Theory was first proposed in the 1960s by neuroscientist Paul MacLean.[10] MacLean proposed the idea that the human brain consists of three parts: the R-complex, the limbic system, and the neocortex.[11] According to MacLean, the reptilian brain is primitive and acts without reflection.[12] It handles basic physical survival responses, including autonomic functions such as breathing, blood pressure, and neurotransmitters when it executes the fight-or-flight response to danger.[13] The limbic system responds to emotions and memories, while the neocortex, or "rational brain," distinguishes humans from animals and supports moral judgment and planning.[14] Astronomer Carl Sagan popularized MacLean's theory, although Sagan believed

---

[6] *Id.*

[7] Louis J. Sirico, Jr., *The Trial Lawyer and the Reptilian Brain: A Critique*, 65 CLEV. ST. L. REV. 411, 412 (2017).

[8] *Id.*

[9] *Id.*

[10] *See* PAUL D. MACLEAN, THE TRIUNE BRAIN IN EVOLUTION: ROLE IN PALEOCEREBRAL FUNCTIONS 15–18 (1989); CARL SAGAN, THE DRAGONS OF EDEN 52–77 (Ballentine Books, 1978).

[11] ANDREW LAUTIN, THE LIMBIC BRAIN 70–71 (2001).

[12] William E. Rees, 2007 Trudeau Fellow, Univ. of British Columbia Sch. of Community and Regional Planning, *Are Humans Unsustainable by Nature?*, Trudeau Lecture at Mem'l Univ. Newfoundland (Jan. 28, 2009).

[13] *Id.* at 4.

[14] *Id.* at 4.

that the three brain systems interacted with each other.[15] Based upon that interaction, Sagan theorized that the reptilian brain response arises not purely out of instinct but also out of instinctual response to learned fear.[16]

Ball and Keenan believed that they could incorporate MacLean's and Sagan's work into persuasion theory as a means to recover larger verdicts in personal injury actions.[17] The goal of Reptile Theory litigation tactics is to force a shift in the jurors' brains from rational to emotional, which forces the jury into survival mode.[18] To force that shift, the plaintiffs' lawyer presents a case that extends the danger created by the defendant beyond the plaintiff to include the jurors' cities, neighborhoods, and homes.[19] Once the limbic brain has been triggered and the jury is in survival mode, logic and factual analysis become secondary to their emotional response. When that occurs, the jurors will react subconsciously and render a verdict based not on factual analysis but on a visceral need to protect themselves.[20]

Ball and Keenan also assert that when humans make decisions that relieve fear, the brain's reward system administers dopamine, the brain's pleasure drug.[21] Because of the strong influence of dopamine on decision making, Ball and Keenan insist, "[C]ontrol dopamine and you control the person."[22] In this way, Reptile Theory is designed to manipulate jurors through primal, subconscious fear and the associated neurotransmitters.

B. THE THEORY IN PRACTICE: THE REPTILE ATTACK

Because fear and survival form the basis of Reptile Theory, the plaintiffs' counsel initiates the successful Reptile Attack by presenting questions to the jury similar to the following:[23]

1. How likely was it that the defendant's act or omission would hurt someone?

2. How much harm could it have caused?

---

[15] SAGAN, *supra* note 10, at 26.

[16] Stephanie West Allen, Jeffrey M. Schwartz, & Diane Wyzga, *Atticus Finch Would Not Approve: Why a Courtroom Full of Reptiles Is a Bad Idea*, THE JURY EXPERT, The American Society of Trial Consultants (May 10, 2010).

[17] BALL & KEENAN, *supra* note 2, at 17–18.

[18] *Id.*

[19] R. Bryan Martin & Dina M. Cox, *The Reptile Theory: Snakes Everywhere—How Not to Lose Your Case during Deposition Cross-Examination*, DEFENSE UPDATE (Iowa Defense Counsel Association), Winter 2018, at 1.

[20] BALL & KEENAN, *supra* note 2, at 30.

[21] *Id.*

[22] *Id.* at 19. (The authors also note, "We are all dopaminaholics." *Id.*)

[23] Kanasky & Malphurs, *supra* note 4, at 4.

3. How much harm could it cause in other kinds of situations?[24]

If the plaintiff succeeds in answering these questions in such a way as to tap into the jurors' reptilian brains, the jurors should develop a sense that the defendant's conduct has and will continue to create "tentacles of danger" that extend throughout the community, with the jurors themselves at risk.[25] Once the Reptile lawyer has extended the tentacles of danger into the community, he then takes the position that the only reasonable safety rule is the broadest, surest, most reliable rule, regardless of cost or difficulty. He then moves on to establish that the defendant's conduct violated the "umbrella" safety rule and that any less stringent rule creates unnecessary danger to the public.[26] An example rule offered by Ball and Keenan is that "a _____ is not allowed to needlessly endanger the public."[27] The plaintiff fills in the blank with the case-specific defendant and tries to illustrate that the defendant placed profits before safety by comparing the defendant's conduct and safety protocols to those employed by other—often unrelated—businesses and using immensely broad, overinclusive examples. Ball and Keenan explain how to present such evidence.

> Your experts can say, . . . "Ignoring the rules of a differential diagnosis will kill patients whether they are in the labor and delivery room as in this case, *or* in an emergency room, *or* in a children's clinic, *or* in any other medical setting." Then have the expert give examples of how it can hurt or kill in each setting. This both explains the nature of the negligence in your case and shows the width and depth of the danger of that kind of negligence.[28]

Once the jurors have heard how far-reaching the defendant's conduct has been and how severe the harm at issue is, the Reptile Theory plaintiff starts the second wave of the attack, which is to persuade the jurors that they can improve everyone's safety through their verdict.[29] This is done by getting the defendant's own witnesses to provide testimony in support of the danger, the ability to avoid it, and the failure to do so, and involves four major phases of the Reptile attack.[30] Each phase targets the basic cognitive and emotional vulnerabilities of all people. The plaintiffs' attorney exploits these vulnerabilities in defendant's witnesses to elicit testimony vital to Reptile Theory. The assault on the witnesses begins long before trial, in depositions and through written discovery.

---

[24] BALL & KEENAN *supra* note 2, at 31–34, 38.

[25] *Id.* at 35.

[26] *Id.* at 55.

[27] *Id.*

[28] *Id.* (emphasis added).

[29] *Id.* at 33, 225, 232.

[30] Kanasky & Malphurs, *supra* note 4, at 4.

In Phase One, the plaintiffs' counsel relies on confirmation bias to get a defendant's witness, often a corporate designee, to agree with overreaching, broad safety rules. Most people believe that keeping people safe is better than putting them in danger and would be prone to accept and agree with Reptile questions.[31] Confirmation bias is a process by which the brain interprets new information in a way that is consistent with existing beliefs.[32] People will quickly accept information that confirms their existing beliefs rather than considering alternative explanations.[33] As a result, most people will also automatically accept any safety principle as absolute and necessary and disclaim conduct that increases risk of harming others.[34] Thus, during Phase One, the plaintiffs' lawyer asks questions similar to the following:

> "Safety is your main priority, right?"
>
> "Isn't it true that you advertise being a nurturing, safe facility?"
>
> "The safety of your patients is your number one priority, isn't it?"[35]

A typical defense witness who has not been warned about Reptile Theory will almost never disagree with, or even qualify a response to these seemingly innocuous questions. By agreeing with those broad principles, the witness has laid the groundwork for Phase Two.

In Phase Two, the plaintiffs' counsel relies on anchoring bias, which is the tendency to incorporate and rely upon early information when called upon to make subsequent decisions or statements.[36] Anchoring bias is very powerful, and most people cannot avoid letting it influence them, even when they are aware of it.[37] Thus, in the second phase of a Reptile attack, the anchor is the witness's initial agreement with the plaintiffs' attorney regarding the general safety rule questions asked in Phase One. In Phase Two the plaintiffs' attorney will use the Phase One anchor to get the witness to agree to subsequent questions that link general safety to the specific issue in the case.[38] During Phase Two, the plaintiffs' lawyer will ask questions such as:

> "If a patient has chest pain and shortness of breath, the safest thing to do is send them to the emergency room immediately, correct?"

---

[31] *See id.*

[32] Paul DiMaggio, *Culture and Cognition*, 23.1 ANNUAL REVIEW OF SOCIOLOGY 263–287 (1997).

[33] Kanasky & Malphurs, *supra* note 4, at 5.

[34] *Id.*

[35] *Id.*

[36] *Id.* at 6.

[37] LEON FESTINGER, A THEORY OF COGNITIVE DISSONANCE (Stanford, Cal. 1957).

[38] Kanasky and Malphurs, *supra* note 4, at 6.

> "You would agree that commercial drivers must maintain daily log books to ensure that other drivers on the road can avoid danger, right?"
>
> "Isn't it true that product testing should be thorough so as to always prevent danger to consumers?"[39]

If the defense witness agrees with the premises of questions like these, he aligns himself with with an inflexible stance on safety issues.[40]

In Phase Three, the plaintiffs' attorney asks questions designed to create cognitive dissonance for the witness.[41] Cognitive dissonance is mental discomfort that occurs when beliefs or attitudes are inconsistent with conduct, prior statements, or decisions.[42] Using that discomfort, the Reptile attorney cherry-picks and highlights case-specific facts that are used to formulate questions depicting the defendant's conduct as contradictory to the witness's previously stated beliefs on safety.[43] The plaintiffs' lawyer tries to characterize the defendant as hypocritical, pointing out the disconnect between the broad safety standard previously discussed and the failure to comply with it. For example, "You testified earlier that you would take any step necessary to prevent assaults in your facility, and yet you did not install sureveillance cameras, correct?" At best, the witness typically identifies the conflict just before or simultaneously with the lawyer's suggestive question, which makes it difficult for the witness to disagree and risk the mental discomfort of cognitive dissonance.

In Phase Four, the plaintiffs' attorney attempts to force an admission of fault through the hypocrisy paradigm, which is the final and most powerful part of the Reptile attack.[44] By accusing the witness of creating danger and failing to adhere to the safety principles with which he aligned himself in Phases One and Two, the attorney forces the witness to admit negligence out of shame or embarrassment.[45] Phase Four questions resemble the following:

> "Failing to call the physician at that first opportunity was a safety rule violation, wasn't it? And that violation exposed the plaintiff to unnecessary risk and harm?"

---

[39] *Id.* at 6–7.

[40] *Id.* at 7.

[41] *Id.*

[42] E. Aronson & J. Mills, *The Effect of Severity of Initiation on Liking for a Group*, 59 J. ABNORMAL & SOCIAL PSYCH. 177 (1959).

[43] Kanasky & Malphurs, *supra* note 4, at 8.

[44] *Id.*

[45] *Id.* at 9

> "Failing to perform an immediate recall after learning of the product's defect endangered consumers, right? Recalling it immediately would have saved the plaintiff, correct?"[46]

After enduring the questioning of Phase Four, the witness usually immediately concedes or tries to change his previous testimony to avoid appearing hypocritical. Either way, the plaintiffs' attorney gains leverage and wins the Reptile attack.

### C. THE THEORY FROM THE CRITIC'S PERSPECTIVE

Critics of the Reptile Theory claim that it ignores the scope of the human brain by erroneously assuming that humans cannot escape their ancient neurobiological past.[47] They argue that this is too cynical a perspective for a trial attorney to adopt, especially when trying to earn the trust of jurors.[48] Opponents criticize the theory for "animalizing" jurors and ignoring the higher brain functions that enable humans to think and reflect.[49] These opponents offer an alternative strategy known as the Narrative Theory, which recognizes the higher brain functions and uses the concept of attention density to guide the thinking of the jurors.[50] Critics posit that, instead of treating jurors like frightened pea-brained snakes,[51] lawyers should consider the nuances of human emotions. Some critics of Ball and Keenan suggest that plaintiffs' attorneys should not use fear to encourage punitive action by jurors, but should use instead anger, which is the better emotion to tap for the desired response.[52]

Despite robust criticism of the Reptile Theory, the plaintiffs' bar continues to use the theory against defendants and, with increasing frequency, initiate the attack in the early stages of litigation.

## II. THE LAW IN VIRGINIA: THE GOLDEN RULE

The defense bar's primary argument against the use of Reptile Theory is that it improperly shifts the focus away from the relevant legal standards and redirects the jurors' focus to general safety rules and other principles that are irrele-

---

[46] *Id.*

[47] Sirico, *supra* note 7, at 411, 413. *See also* Allen, Schwartz, & Wyzga, *supra* note 16, at 1 ("To equate men and women serving on a jury with reactive sub-mammals is both offensive and objectionable.")

[48] PAUL MARK SANDLER, ANATOMY OF A TRIAL: A HANDBOOK FOR YOUNG LAWYERS, xx–xxiv (2d ed. 2014) ("Do not underestimate the intelligence of your jury. The jurors will know if you have done so and will resent it.")

[49] Allen, Schwartz, & Wyzga, *supra* note 16, at 4.

[50] *Id.* (citing J.M. SCHWARTZ & S. BEGLEY, THE MIND AND THE BRAIN: NEUROPLASTICITY AND THE POWER OF MENTAL FORCE (2002)).

[51] BALL & KEENAN, *supra* note 2, at 30.

[52] THOMAS M. O'TOOLE, DEFEATING THE REPTILE: STRATEGIES FOR DISMANTLING THE PLAINTIFF'S REVOLUTION (2015).

vant to the case.[53] In many jurisdictions, including Virginia, lawyers cannot encourage jurors to decide verdicts based upon how they would feel if they were parties in the case.[54] This notion has evolved into a general prohibition of the Golden Rule in courtroom argument, as "[t]he vice of a 'golden rule' argument is that it encourages a jury to depart from neutrality and to decide a case on the basis of personal interest and bias rather than on the evidence."[55] Every jurisdiction prohibits the Golden Rule to some degree.[56] Jurors cannot be asked to evaluate the case as though they themselves have a stake in the outcome.

The Supreme Court of Virginia first directly addressed the Golden Rule in *Seymour v. Richardson*[57] when the plaintiff's attorney stated in closing argument, "All [the plaintiff] asks you gentlemen to do when you retire to your jury room is to apply the Golden Rule. Do unto [the plaintiff] as you wish that you would be done."[58] In *Seymour*, the original plaintiff sustained injuries in an automobile accident involving the defendant driver and his corporation.[59] The passenger died of unrelated causes before trial and his wife, the administratrix of his estate, was substituted as the plaintiff.[60] The jury returned a verdict in favor of the plaintiff and the main issue on appeal was whether the mental anguish of the decedent was a proper element of damages.[61] The Supreme Court found it unnecessary to address the other assignments of error but noted that the plaintiffs' attorney's aforementioned remark in closing argument "was improper and should not be repeated" because "[t]he function of the jury is to decide according to the evidence, not according to how its members might wish to be treated."[62]

In 2003, the Supreme Court again held as reversible error plaintiff's counsel's repeated requests to the jurors during closing argument that they apply the Golden Rule.[63] In *Velocity Express v. Mid-Atlantic v. Hugen*, also an automobile

---

[53] *See* Martin & Cox, *supra* note 18. See query at FN 19.  page cite?

[54] *See, e.g.*, Kevin Sewell v. State of Maryland, Docket No.2016-2188, 2018 Md. App. Lexis 212, Md. Ct. of Spec. App. of Maryland (Mar. 5, 2018) ("'Golden Rule' arguments encourage jurors to consider their own interests in deliberation rather than the evidence presented"); *see also* Lycans v. Commonwealth, 562 S.W.2d 303, 305 (Ky. Sup. Ct. 1978) ("[A] golden rule type of argument is one that urges the jurors collectively or singularly to place themselves or members of their families or friends in the place of the person who has been offended and to render a verdict as if they or either of them or a member of their families or friends was similarly situated.")

[55] Miller v. Kenny, 180 Wn. App. 772, 782, 325 P.3d 278, 283(2014), 2014 Wash. App. Lexis 1030, *1, 2014 WL 1672946 (Wash. Ct. App. 2013).

[56] David C. Marshall, *Legal Herpetology: Lizards and Snakes in the Courtroom*, For the Defense Apr. 2013, at 64.

[57] 194 Va. 709, 75 S.E.2d 77 (1953).

[58] *Id.* at 715, 75 S.E.2d at 81.

[59] *Id.* at 709–10.

[60] *Id.*

[61] *Id.*

[62] *Id.* at 715, 81 (citing Lorillard Co. v. Clay, 127 Va. 734, 752, 104 S.E. 384, 390 (1920)).

[63] Velocity Express Mid-Atl. v. Hugen, 266 Va. 188, 202, 585 S.E.2d 557, 565 (2003).

accident personal injury case, the plaintiff argued that wealthy people would receive the medical attention of a licensed practical nurse, as opposed to the treatment the plaintiff received by a certified nurse's aide.[64] Plaintiffs' counsel argued to the jury: "Suppose your husband were choking to death and he couldn't open his mouth? Do you want an aide trying to get your husband's throat clear or would you like to have a nurse . . . while you're at work?"[65] After defense counsel objected, plaintiffs' counsel apologized and told the jury that he misspoke, stating, "That was an improper question. Don't imagine your family members."[66] However, he then immediately stated, "But if you were responsible for someone, who would you want there?"[67] The Supreme Court reasoned that the plaintiff's continual invocation of Golden Rule arguments was highly prejudicial and that counsel may not ask jurors to put themselves in the place of the parties.[68]

Defense motions in limine to preclude Golden Rule arguments often cite *Seymour* and *Velocity Express*, in addition to cases that support the elements and standards at issue in the particular case. At trial, defendants must object to every Golden Rule reference, no matter how slight, to properly preserve the issue for appeal pursuant to Rule 5:25 of the Rules of the Supreme Court of Virginia.[69] Published law on the Golden Rule is sparse in part due to counsel's failure to timely and properly object. For example, in *Rose v. Jaques*, an automobile accident personal injury case, the plaintiff's attorney asked the jury to "imagine one day to wake up and look in the mirror and think you're looking at the same person, and think that—what's wrong with these people around me? Why are they acting bad? Because that's the tragedy of the person."[70] The plaintiff's attorney also stated, "I just want you to imagine what she goes through every day of her life, and imagine what you can do."[71] Because defense counsel did not fully object to these statements, the Supreme Court could not review whether they constituted improper Golden Rule arguments.[72]

---

[64] *Id.* at 192, 585 S.E.2d at 560.

[65] *Id.* at 196, 585 S.E.2d at 560.

[66] *Id.*

[67] *Id.*

[68] *Id.* at 203, 585 S.E.2d at 565.

[69] VA. SUP. CT. R. 5:25.

[70] Rose v. Jaques, 268 Va. 137, 158, 597 S.E.2d 64, 76 (2004).

[71] *Id.*

[72] *Id.* ([F]ailure to timely object to the Golden Rule will bar appellate review those Golden Rule arguments. *See* Lorillard Co. v. Clay, 127 Va. 734, 753, 104 S.E. 384, 390 (1920) ("Trial courts are not expected to be alert to discover every remark of counsel that may in any way be prejudicial to the opposing party, and if no objection is made to such remarks it is deemed to be waived. The objection, to be available in this court, should have been made at the time the argument was made, and certainly before the verdict was rendered."))

### III. Moving beyond the Golden Rule and Confronting the Reptile

To skirt Supreme Court of Virginia precedent against the Golden Rule, plaintiffs' counsel in Virginia have become more subtle when seeking to introduce Reptile Theory into their cases and into the courtroom. In contrast to the Golden Rule argument, the Reptile Attack is a more insidious appeal to the jurors' emotions, relying upon subconscious effects of evidence of public danger and safety, and survival instinct. The Reptile lawyer need not directly ask jurors to place themselves in the shoes of the parties because the plaintiff's arguments lead the jurors to "feel" that the defendant's conduct represents a danger to them and imperils their survival and that of their families.[73] It is easy to see why the Reptile Attack has been described as a "veiled Golden Rule argument" because it implicitly places the jurors in the shoes of the plaintiff by asking jurors to render verdicts based on the potential for community-wide harms and losses.[74] The purpose behind the Reptile Attack is to incite the passion, prejudice, and sentiment of the jury based upon self-preservation and a "gut reaction" that a verdict for the defendant will harm the community.[75] Ball and Keenan instruct attorneys using reptilian tactics to convince jurors that "the safer decision for the community (and thus the individual juror) is a fair verdict for [the plaintiff]"[76] and "[o]nly a verdict [for the plaintiff] can make them safer."[77] Ball and Keenan outline Golden Rule law by jurisdiction and describe the limits of community safety arguments.[78] Therefore, while a Reptile Attack may not specifically invoke the Golden Rule, the intent is the same. Jurors subject to successful Reptile Attack will base their verdict not on the evidence of the case but on the fear that they or their families could be injured by the immediate danger of similar conduct by the defendant.[79]

Although Virginia courts have disfavored Golden Rule arguments for several decades, there are no published cases that address reptilian tactics. The initial reaction of panic that the defense bar experienced upon the 2009 publication of *Reptile* may be dissipating, but reptilian tactics are not. The plaintiffs' bar continues to employ these tactics in a variety of cases throughout all stages of litigation. A Reptile Attack during the deposition of an expert or a corporate designee can improve the plaintiff's position in pretrial settlement negotiations. Comments during voir dire that allude to tentacles of danger and public risk can poison jurors against the defendant at the outset of the case.[80] Defense counsel

---

[73] Hensley v. Methodist Healthcare Hosps., 2015 U.S. Dist. Lexis 113565, 2015 WL 5076982 (W.D. Tenn. Aug. 27, 2015).

[74] Marshall, *supra* note 56, at 68.

[75] Randolph v. QuikTrip Corp., 2017 U.S. Dist. Lexis 76103, 2017 WL 2214932, at *4 (D. Kan. May 18, 2017).

[76] Ball & Keenan, *supra* note 2, at 99.

[77] *Id.* at 39.

[78] *Id.* at 267–326, 328–30.

[79] Marshall, *supra* note 56, at 69.

[80] Conflicting viewpoints exist on the timing of jurors' decision making. Some research shows that jurors make up their minds long before closing arguments. *See* D.E. Broeder, *The University of Chicago Jury Project*,

must therefore always consider early and proactive intervention against reptilian tactics.

### A. COMBATTING THE REPTILE

Arguments against reptile tactics are newer than those against the Golden Rule, and Virginia courts may be less willing to sustain motions in limine by defendants seeking to exclude them, particularly before the evidence or argument is heard.[81] Therefore, it is important for defense counsel to recognize reptilian tactics in their opponents' strategies as early as possible in the litigation and to timely and effectively raise the issue before trial. The deposition of the corporate representative is often the first setting in which the plaintiff will employ reptilian tactics. Defense counsel must anticipate the use of these tactics via written objection to the plaintiff's 30(b)(6) notice.[82] At the deposition, defense counsel should timely object to each reptilian question to preserve it for a future motion to exclude and should not lodge a continuing objection.[83]

Regardless of the timing of plaintiff's first use of reptilian tactics, Virginia Model Jury Instruction 2.220 is a starting point for any argument against them:

> You must not base your verdict in any way upon sympathy, bias, guesswork, or speculation. Your verdict must be based solely upon the evidence and instructions of the Court.[84]

By attempting to present overly broad evidence or argument about community safety and danger, the plaintiff improperly shifts the focus away from the issues in the case—namely, the damages sustained by the plaintiff. This practice arguably deprives the defendant of the constitutional right to a fair trial because, when the decision makers are urged to believe that the alleged wrongdoing ex-

---

38 NEB. L. REV. 744–61 (1958) (finding that 80% of jurors formed initial opinions after opening statements). Other research shows that most jurors change their minds during trial. *See* P.L. Hannaford, V.P. Hans, N.L. Mott, G.T. Munsterman, *The Timing of Opinion Formation by Jurors in Civil Cases: An Empirical Examination*, 67 TENN. L. REV. 627–652 (2000) (finding that 95% of jurors change their minds at least once during trial). Regardless, social science studies in human persuasion consistently show that it is difficult, if not impossible, to change a juror's mind once it has been made up. *See* Richard E. Petty & John T. Cacioppo, Communication and Persuasion 126–30 (1986); SHARON S. BREHM & JACK W. BREHM, PSYCHOLOGICAL REACTANCE: A THEORY OF FREEDOM AND CONTROL (1981).

81 *See, e.g.*, Turner v. Salem, 2016 U.S. Dist. LEXIS 102239 (D.N.C. July 29, 2016) (holding that Golden Rule arguments are prohibited and the court discourages Reptile Theory arguments, but will handle objections to statements purported to be Reptile Theory arguments as the need arises). *See also* Bostick v. State Farm Mut. Auto Ins. Co., 2017 U.S. Dist. LEXIS 113897 (M.D. Fla. Jul 21, 2017) (granting defendant's motion in limine as to the Golden Rule but denying defendant's motion as to community safety standards and allowing the jury to consider the extent to which the defendant company allegedly failed to comply with those standards).

82 R. Bryan Martin & Dina M. Cox, *The Reptile Theory: Snakes Everywhere—How Not to Lose Your Case during Deposition Cross-Examination*, DEFENSE UPDATE (Iowa Defense Counsel Association), Winter 2018, at 1.

83 *See, e.g.*, Jones v. Ford Motor Co., 263 Va 237, 559 S.E.2d 592 (2002); Graham v. Cook, 278 Va. 233, 682 S.E.2d 535 (2009).

84 VA. MODEL JURY INSTR. 2.220. *See also* Marshall, *supra* note 56, at 69. ("[I]t is rudimentary that a jury cannot base its verdict on matters not in evidence, conjecture, or speculation.")

tends beyond the facts and circumstances of the case, their verdict is unlikely to be based solely upon the evidence at trial. In response to the plaintiff's implication regarding potential injuries or damages that could have been inflicted, defense counsel can argue that such evidence is irrelevant and inadmissible pursuant to Virginia Rules of Evidence 2:401 and 2:403. In products liability cases, evidence of other similar accidents or occurrences is admissible to establish foreseeability if the situation was substantially similar.[85] Still, admissibility in these limited circumstances does not make reptilian tactics proper even in products liability cases, and counsel defending products cases should object to any reference to dissimilar acts generally.

Cases involving claims for punitive damages remain especially vulnerable to reptilian tactics because punitive damages punish the defendant and protect the public by deterring others from engaging in the same or similar conduct.[86] The forward-thinking plaintiffs' lawyer could include a claim for punitive damages in initial pleadings in part so that he can later make Reptile Attack arguments about the same or similar conduct. However, the Due Process Clause does not allow courts to adjudicate the merits of hypothetical claims against a defendant.[87] An argument that the defendant exhibited similar behavior numerous times before the incident in the specific case is different from an argument that the defendant could have endangered jurors' families in the past or could endanger jurors' families in the future.[88] Defense counsel must make this distinction when arguing against such tactics in cases involving punitive damages.

Despite the relative novelty of motions in limine against reptilian tactics per se, courts often agree with the notion that words uttered in front of the jury must be about the case at issue. Therefore, defendants might prevail in motions that indirectly malign the Reptile Theory but focus upon well-founded principles of law. For example, as the federal court did in the Western District of Kentucky in 2017, Virginia courts might agree that any argument asking the jury to "send a message" or "act as the conscience of the community" goes beyond the application of the law to the facts of the case.[89] When confronting reptilian tactics generally but also in the context of punitive damages claims, the defense has successfully argued against this reptilian-like "send a message" mentality.

---

[85] Jones v. Ford Motor Co., 263 Va. 237, 242, 559 S.E.2d 592, 594 (2002).

[86] Allstate Ins. Co. v. Wade, 265 Va. 383, 579 S.E.2d 180 (2003). *See also* VA. MODEL JURY INSTR. 9.080.

[87] State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 424 (2003) ("A defendant's dissimilar acts, independent from the acts upon which liability was premised, may not serve as the basis for punitive damages. A defendant should be punished for the conduct that harmed the plaintiff, not for being an unsavory individual or business.")

[88] *See, e.g.*, Coalson v. Canchola, 287 Va. 242, 250-51, 754 S.E.2d 525, 529 (2014) (holding that the punitive damages award did not violate due process where the defendant motorist drove while severely intoxicated; the plaintiff was physically injured; the defendant had seven prior DWI convictions; and DWI could result in death).

[89] *See* Brooks v. Caterpillar Global Mining Am., 2017 U.S. Dist. LEXIS 125095 (W.D. Ky. Aug. 8, 2017) ("[A]ny argument by Plaintiffs' counsel that attempts to urge the jury to render a verdict against Defendant on the basis of fear for the safety of the community or fear for the safety of the jury and their families is inappropriate.")

The Sixth Circuit deemed improper arguments that urge the jury to send a message to the defendant through punitive damages.[90] In that case, the plaintiffs' counsel said the following in closing argument:

> You can tell a manufacturer [that] your product is unsafe, and your voice will be heard . . . . You come in here as the voice of the community . . . . Do you want to live in a world where [the defendant company] makes the rules . . . . You have an opportunity . . . to tell [the defendant], to tell the world where you stand, whether you stand for safe products and decency.[91]

Although the court remanded the case on unrelated grounds, it noted that an "'us-against-them plea can have no appeal other than to prejudice . . . and is an improper distraction from the jury's sworn duty to reach a fair, honest and just verdict.'"[92] The central premise of the defense argument remains steadfast: that the evidence and arguments must focus on the matters in the case and not on extraneous issues and emotions.[93] Courts may also entertain defense motions in limine against reptilian-style arguments that seek to inflame the passions of the jury.[94] In Virginia, defendants have not made these motions with sufficient frequency and thus the case law is lacking. The defense bar must persist in making these motions because, even if unsuccessful, courts will continue to hear about—and will begin watching for—the reptile.

## IV. Conclusion

Although the law in Virginia prohibits explicit reference to the Golden Rule, it does not address subtle or indirect invocation of the Reptile Attack. The defense bar must remain cognizant of these attempts by plaintiffs' counsel to elicit verdicts based upon an emotional response rather than on the facts of the case. The proper antidote to the reptile is a reminder from the defense bar that justice results only from decisions based on the evidence and instructions of the court.

---

[90] Strickland v. Owens Corning, 142 F.3d 353, 358–59, 1998 U.S. App. Lexis 7761, *13–16 (6th Cir. 1998).
[91] Id.
[92] Id. at 359 (citing Westbrook v. General Tire & Rubber Co., 754 F.2d 1233, 1238 (5th Cir. 1985)).
[93] See Triplett v. Napier, 286 S.W.2d 87, 90 (Ky. App. 1955).
[94] See K.C. v. Schuckker, 2013 U.S. Dist. Lexis 119161 (denying defendant's motion in limine but noting that "the Court will not tolerate any attempt by either party to incite the jury to render a verdict based on any other consideration, including the passions and prejudice of the jurors.")